P. SCHOENFELD ASSET MANAGE-MENT LLC, on behalf of itself and all others similarly situated, Plaintiff,

v.

CENDANT CORP., Walter A. Forbes, E. Kirk Shelton, Cosmo Corigliano, Christopher McLeod and Ernst & Young, LLP, Defendants.

George Semerenko, on behalf of himself and all others similarly situated, Plaintiff,

v.

Cendant Corp., Walter A. Forbes, E. Kirk Shelton, Cosmo Corigliano, Christopher McLeod and Ernst & Young, LLP, Defendants.

Nos. CIV. 98–4734(WHW), CIV. 98–5384(WHW).

United States District Court, D. New Jersey.

May 7, 2001.

Joseph DePalma, Lite DePalma Greenberg & Rivas LLC, Newark, NJ, for Plaintiffs.

Carl Greenberg, Budd Larner Gross Rosenbaum, Greenberg & Sade, P.C., Short Hills, NJ, for Cendant Corporation.

Douglas Eakeley, Lowenstein Sandler, PC, Roseland, NJ, for Ernst & Young, LLP.

Richard Schaeffer, Dornbusch Mensch Mandelstam & Schaeffer, LLP, New York City, for E. Kirk Shelton.

Steven Radin, Sills Cummis Radin Tischman Epstein & Gross, Newark, NJ, for Christopher K. McLeod.

## OPINION

WALLS, District Judge.

Defendants Cendant Corporation, Inc. ("Cendant"), Ernst & Young, LLP ("E & Y"), E. Kirk Shelton ("Shelton"), and Christopher K. McLeod ("McLeod") have renewed their motions to dismiss the Amended Complaints in the above actions.[1] The Third Circuit's August 10, 2000 Opinion (the "August 10 Opinion") reversed and remanded this court's earlier determination to dismiss the complaint under Rule 12(b) for failure to state a claim under Section 10(b) and Rule 10b 5, and claims against individual defendants for control person liability under Section 20(a). *See Semerenko v. Cendant Corp. et al.*, 223 F.3d 165 (3d Cir. Aug.10, 2000). Issues now before the Court are:

1. Whether plaintiffs' allegations against E & Y satisfy the "in connection with" requirement of Section 10(b);

2. At what point in time Cendant's alleged misrepresentations could no longer be trusted sufficient to fulfill the reasonable reliance requirement;

3. Whether the complaint must be dismissed against Cendant, E & Y, Shelton and McLeod for failure to plead fraud and scienter with particularity; and

4. Whether plaintiffs have sufficiently plead Section 20(a) claims against Shelton and McLeod.

This Court holds that plaintiffs have satisfied the "in connection with" requirement as to E & Y. The Court also concludes that plaintiffs have adequately plead scienter against E & Y and Shelton. The Court finds, however, that plaintiffs have failed to plead scienter against Cendant with regard to claims by purchasers of ABI stock after April 15, 1998. The Court grants plaintiffs' request for leave to file an Amended Complaint to add allegations against McLeod sufficient to plead fraud

---

1. Because the Amended Complaints in the two actions are identical except for the captions and identification of parties, they are referred to as the "Amended Complaint" or "Complaint."

and scienter with particularity, but holds that McLeod may not be liable to post-April 15, 1998 purchasers. Consequently, this Court denies E & Y's motion to dismiss the Section 10(b) claim; grants Cendant's motion to dismiss plaintiffs' Section 10(b) claims based upon post-April 15, 1998 purchases of ABI stock; denies Shelton's and McLeod's motions to dismiss plaintiffs' Section 10(b) and Section 20(a) claims for purchasers before April 15, 1998, and grants Shelton's and McLeod's motions to dismiss Section 10(b) and 20(a) claims as to post-April 15, 1998 purchasers. It further directs plaintiffs to file their Second Amended Complaint within fifteen days of the date of entry of this Opinion and Order. Finally, this Court holds that to the extent certain defendants have not moved to dismiss post-April 15, 1998 claims, plaintiffs could reasonably rely upon the alleged misrepresentations in the April 15, 1998 announcement until July 14, 1998, when Cendant announced that the accounting restatements would actually be much greater than originally anticipated and affected other major CUC business units.

## BACKGROUND [2]

This Court's earlier opinion dismissed the Complaint on several grounds, including (1) that plaintiffs had failed to satisfy the "in connection with" requirement of Section 10(b) and Rule 10b 5; (2) plaintiffs failed to establish reasonable reliance on the alleged misrepresentations; and (3) plaintiffs failed to establish loss causation. *See P. Schoenfeld Asset Management LLC v. Cendant Corp.,* 47 F.Supp.2d 546 (D.N.J. April 30, 1999) (the "April 30 Opinion"). Accordingly, the Court also dismissed the Class's Section 20(a) claim against the individual defendants on the basis that a claim for control person liability cannot be maintained in the absence of an underlying violation of the Exchange Act. Because of its decision to dismiss the Complaint under Rule 12(b)(6), this Court did not determine whether the Class's complaint also failed to satisfy the heightened pleading requirements of Rule 9(b).

By its August 10 Opinion, the Third Circuit remanded and directed this Court to apply the standards enunciated by the Second and Ninth Circuits in their discussions of the "in connection with" requirement when the alleged fraud involves the public dissemination of false and misleading information. Those circuits have held that

> ... where the alleged fraud involves the public dissemination of information in a medium upon which an investor would presumably rely, the "in connection with" element may be established by proof of the materiality of the misrepresentation and the means of its dissemination.

*Semerenko,* 223 F.3d at 176, citing *In re Ames Dep't Stores Inc. Stock Litig.,* 991 F.2d 953, 963, 965 (2d Cir.1993); *Securities & Exch. Comm'n v. Rana Research, Inc.,* 8 F.3d 1358, 1362 (9th Cir.1993); *In re Leslie Fay Cos. Sec. Litig.,* 871 F.Supp. 686, 698 (S.D.N.Y.1995).

Furthermore, the Third Circuit held that Class members could have reasonably relied upon the anticipated restatement of Cendant's 1997 financial information discussed in the April 15, 1998 announcement and were not precluded from reasonable reliance on the defendants' later statements about Cendant's intent to merge with ABI. *Id.* at 183. However, the Circuit also held that Class members were not entitled to indefinite reliance upon the

---

**2.** The factual and procedural background of this matter is fully discussed in this Court's earlier opinion, *P. Schoenfeld Asset Manage-* *ment LLC v. Cendant Corp.,* 47 F.Supp.2d 546 (D.N.J. April 30, 1999) (the "April 30 opinion"), and in *Semerenko,* 223 F.3d 165.

alleged April 15, 1998 misrepresentations, explaining that Cendant (1) announced on July 15, 1998 that it had revised the restatement of its 1997 income; and (2) disseminated the formal results of the Audit Committee's investigation on August 27, 1998. The Court of Appeals observed that one or both of these actions might have cured the effect of the alleged misrepresentations in the April 15, 1998 announcement and rendered the disclosure thereafter unreliable. *Id.* This Court was required to determine "the point at which the particular misrepresentations could no longer be trusted." *Id.*[3]

Lastly, the Third Circuit instructed this Court to determine whether, if the Section 10(b) requirements are met, the Complaint should nevertheless be dismissed because of plaintiffs' failure to satisfy the heightened pleading requirements for fraud under Rule 9(b). *Id.* at 173, 187.

In its renewed motion, Cendant seeks dismissal of the plaintiff's claims based upon purchases of ABI stock after April 15, 1998. All defendants, except Corigliano and Forbes who have not renewed their motions, seek dismissal of the complaint for failure to plead fraud and scienter with particularity.[4] Shelton and McLeod seek dismissal of the Section 20(a) claims against them, apparently in recognition that their concession of the "in connection with" requirement for purposes of the 12(b)(6) motion resurrects those claims unless the complaint is dismissed for failure to plead fraud or scienter with particularity.

## DISCUSSION

### I. Standard for a Motion to Dismiss

Under Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See In re Cendant Corp. Derivative Action Litig.,* 189 F.R.D. 117, 127 (D.N.J.1999); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his allegations that will entitle him to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions case in the form of factual allegations. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *See* Fed. R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West*

---

**3.** The Court of Appeals also concluded that because the market-and class members-could not have reasonably relied upon Cendant's previous financial statements or audit reports following the April 15, 1998 announcement, E & Y cannot be held liable to the Class members who purchased ABI stock after April 15, 1998. *Id.* at 181. The Third Circuit determined that plaintiffs had plead adequately the element of loss causation because they alleged both that the securities were purchased at

artificially inflated prices due to misrepresentation and that the price declined sharply after disclosure of the alleged misrepresentations. *Id.* at 185–186. However, no further findings were required as to these elements.

**4.** Forbes initially renewed his motion to dismiss under Rule 9(b) but later withdrew that motion.

*Penn Power Co.,* 147 F.3d 256, 258 (3d Cir.1998).

## II. *Section 10(b) and Rule 10b–5*

As the Court has written, *see In re Cendant Corp. Litig.,* 60 F.Supp.2d 354 (D.N.J.1999); *see also Kennilworth Partners L.P. v. Cendant Corp.,* 59 F.Supp.2d 417 (D.N.J.1999); *P. Schoenfeld Asset Management LLC v. Cendant Corp.,* 47 F.Supp.2d 546, 552 (D.N.J.1999), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under Section 10(b), it is unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. 15 U.S.C. § 78j(b). To implement the statute, the SEC enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see also In re Cendant Corp. Litig.,* 60 F.Supp.2d at 367–68. That Rule makes it unlawful: (1) "[t]o employ any device, scheme, or artifice to defraud," (2) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Supreme Court has held that standing to bring a private cause of action under Rule 10b–5 is limited to actual purchasers or sellers of securities. *Blue Chip Stamps,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.

■ This tort, although statutory in origin, sounds in the common law of fraud and deceit and retains, in modified form, the common law elements of duty, breach, causation, and damage. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 547 (5th Cir.1981) (10b–5 claim derived from common law action for deceit), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *see also In re Cendant Corp. Litig.,* 60 F.Supp.2d at 368–69. The plaintiff must prove knowledge by the defendant, an intent to defraud, misrepresentation or failure to disclose, materiality of the information, and injurious reliance by the plaintiff. *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.1973). More precisely, these elements form the following test: To form a 10b–5 claim, a plaintiff must allege that the defendant made (1) a misstatement or an omission (2) of a material fact (3) with scienter (knowledge) (4) in connection with the purchase or sale of a security (5) upon which plaintiff reasonably relied, and (6) that reliance proximately caused injury to the plaintiff. *Kline v. First Western Government Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied sub nom., Arvey, Hodes, Costello & Burman v. Kline,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989) (citing *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 942–43 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985)); *see also In re Cendant Corp. Litig.,* 60 F.Supp.2d at 368–69.

## III. *Analysis*

### A. *Whether Plaintiffs Have Satisfied the "In Connection With" Requirement*

■ As reviewed, the Third Circuit directed this Court to apply the "in connec-

tion with" requirement under standards enunciated by the Second and Ninth Circuits, that

> [when] the alleged fraud involves public dissemination of information in a medium upon which an investor would presumably rely, the "in connection with" element may be established by proof of the materiality of the misrepresentation and the means of its dissemination.

223 F.3d at 176, citing *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d at 963, 965; *Securities & Exch. Comm'n v. Rana Research, Inc.*, 8 F.3d at 1362; *In re Leslie Fay Cos. Sec. Litig.*, 871 F.Supp. at 698. Specifically, the Circuit allowed:

> [T]he Class may establish the "in connection with" element simply by showing that the misrepresentations in question were *disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated.*

*Id.* at 176 (emphasis added). This Court was also directed to determine whether defendant E & Y "knew or had reason to know that Cendant would use its financial statements and audit reports when making a tender offer for shares of ABI common stock." *Id.* at 177. The Circuit cautioned, however, that "the issue of materiality typically presents a mixed question of law and fact, and ... the delicate assessment of inferences is generally best left to the trier of fact," and accordingly directed this Court to "decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *Id.* at 178.

E & Y is the only defendant to address this issue in its renewed motion.[5] The parties' arguments on this point focus on whether the E & Y's statements were foreseeably used in connection with the ABI tender offer. Specifically, they focus on whether E & Y's opinions were actually contained in the tender offer documents and whether E & Y gave its consent to do so. E & Y argues that plaintiffs have not established either that E & Y's audit opinions were actually included in the tender offer materials issued by Cendant to ABI investors or that it was foreseeable to E & Y that its opinions would be included in those materials. *See* E & Y Brief in Support of Renewed Motion to Dismiss ("E & Y Remand Br."), at 7. E & Y contends that the 1995 and 1996 Audit Opinions were not material at the time they were disseminated because at that time, no merger with ABI was contemplated. *Id.* Moreover, neither the opinions nor a discussion of the opinions were actually included in the tender offer documents and thus cannot be considered disseminated again at the time of the tender offer. *Id.* at 8. Furthermore, because E & Y cannot have known about the potential future merger with ABI when the 1995 and 1996 audit opinions were issued, it was not foreseeable that the two opinions would be used by Cendant in its tender offer documents. *Id.* E & Y claims that it never consented to the use of the audit opinions and thus could not have reasonably foreseen that the opinions would be used in connection with the ABI tender offer.

E & Y also asserts that its 1997 audit report was not included in the tender offer documents and that plaintiffs have failed to allege that E & Y knew or had reason to

---

5. All defendants who renewed their motions, except E & Y, confirmed that under the Third Circuit's enunciation of the standard, they no longer contest the adequacy of the pleadings under the "in connection with" test. Cendant did not address the requirement in its original motion.

know Cendant would use the 1997 audit opinion with regard to CMS' 1997 financial statements when it made the tender offer. *Id.* at 9–10. This defendant states that it was never asked to consent to the use of that opinion in materials directed toward ABI investors. *Id.* at 10. Consequently, E & Y claims that plaintiffs have failed to meet the "in connection with" test. *Id.* at 9–10.

In response, plaintiffs submit portions of Cendant's S–4 Registration Statement filed February 20, 1998 with the SEC as part of the proposed merger which was to go forward if and when the tender offer was completed. The S–4 includes a "Consent" by E & Y, which reads:

> We consent to the reference of our firm under the caption 'Experts' and to the use of our report dated March 10, 1997 [with respect to the consolidated financial statements of CUC International Inc.], included in the Current Report on Form 8–K, dated January 29, 1998, and incorporated by reference in the Proxy Statement filed by Cendant Corporation ... in connection with its offer to purchase 23,501,260 shares of common stock of American Bankers Group, Inc....

*See* Pizza Affidavit, Ex. B. at p. 16. The March 10, 1997 report is E & Y's unqualified audit opinion of CUC's consolidated financial statements for the fiscal years that ended January 31, 1997 and 1996. *See* Pizza Affidavit, Ex. C, at p. 20. That report stated, among other things:

> In our opinion, based on our audits and the reports of the other auditors, the supplemental consolidated financial

statements referred to above present fairly, in all material respects, the financial position of Cendant Corporation and subsidiaries at December 31, 1996 and 1995, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1996 in conformity with generally accepted accounting principles.

*Id.* As a result, plaintiffs argue that E & Y's contention that it never consented to the use of its audit opinions in the tender offer documents is false and that the audit opinion regarding Cendant's 1995 and 1996 financial statements was made a part of the 14D–1 with E & Y's unqualified consent. *See* Plaintiff Br., at 43.[6] Plaintiffs also emphasize that the Third Circuit did not require the opinion itself to be contained in the 14D–1 statement but rather only that E & Y had reason to know that its audit opinion would be advanced by Cendant when it made the tender offer. Plaintiffs point out that given the formal consent, the contention that it was not foreseeable that the opinion would be used in connection with the tender offer is not credible. Plaintiff Br. at 44. Plaintiffs also dispute E & Y's contention that E & Y would have had to know of the tender offer at the time the report itself was made to establish the "connection," arguing not only that this is an illogical extension of the Third Circuit's holding but that it would be absurd in light of Regulation 14D–1 and Regulation S–K 301(a) requirements of audited financial data for five previous years to be included. *See* Plaintiff Br. at 45 and n. 23.[7]

---

**6.** Both E & Y and plaintiffs emphasize that E & Y never objected to the "in connection with" requirement in the main Cendant class action because there, E & Y did give its consent to CUC's use of E & Y's audited opinions for the years in question in the Registration Statement issued in connection with the HFS/

CUC merger. *See* Plaintiff Br., at 43 n. 22; E & Y Br., at 9.

**7.** On reply, E & Y asserts that plaintiffs conceded that the 1995 and 1996 financial statements could not have been "in connection with" the tender offer because they were made long before the tender offer was made.

However, E & Y replies that the February 1998 document was only a "preliminary copy" of a proposed registration statement—which was never disseminated in any format to investors—for a transaction that was never finalized,[8] and that the 14D–1 for the ABI tender offer discussed in the Complaint is the one filed on January 27, 1998, which does not even mention E & Y. E & Y Reply at 1–4.[9] As a result, even if Plaintiffs' argument were accepted, it would allow only purchasers of ABI stock after February 20, 1998 to maintain an action. E & Y Reply at 2. Plaintiffs reply that although the document was only a preliminary copy and filed with regard to the second portion of the transaction, it nevertheless shows that E & Y was not surprised that its name was used in connection with the tender offer, specifically in the tender offer documents.

E & Y points out that misstatements by E & Y in the February 1998 registration statement have not been alleged by plaintiffs at any time in the complaints. E & Y Reply at 2. It also avers that because plaintiffs chose to appeal this Court's dismissal of the complaints without seeking leave to replead, and because the Third Circuit expressly took the appeal on the understanding that plaintiffs had waived any right to file an amended complaint, they cannot now amend the complaint. See E & Y Reply, citing Semerenko, 223 F.3d at 173 & n. 3 (plaintiffs are "not free

to add new factual allegations to comply with Rule 12(b)(6)").

The 1997 financial statements were issued on March 31, 1998, after the tender offer was made. At oral argument, plaintiffs contended that the 1997 financial statement "stands on its own." Plaintiffs appear to argue that because the tender offer had already been made, it is no defense that the March 31, 1998 report made no mention of the ABI tender offer, so long as it was material to the investors' decisions and was in a public medium upon which investors would rely. See Plaintiff Br. at 46. E & Y responds that it does not matter that the statements were made after the tender offer was made, because statements in the March 31, 1998 report were not "aimed at" ABI investors. See E & Y Reply at 7. Moreover, at oral argument E & Y maintained that the 14D–1 makes no reference to the March 1998 financial statements.

At that oral argument, plaintiffs also pointed out that although the January Schedule 14D–1 filed with the SEC incorporates excerpted financial data from its financial statements, and directs readers:

Additional financial information is included in other documents filed by Parent with the SEC. The *financial information summary set forth below is qualified in its entirety by reference to*

---

Plaintiffs actually claim that it does not matter that those audit opinions were issued long before because they were incorporated into the February 1998 S–4. E & Y also interprets Plaintiffs' argument to concede that E & Y's consent was necessary for it to have foreseen the inclusion of its statements in the tender offer documents. Plaintiffs do not appear to argue that E & Y's consent was necessary.

8. This transaction would have been a "back-end merger," which was to be go forward only after the ABI tender offer was completed. The proxy statement/ registration state-

ment/ prospectus would have been mailed to ABI shareholders after the tender offer was completed. See E & Y Reply at 4 n. 1.

9. Nevertheless, E & Y does acknowledge that the document was filed with the SEC, and relies mainly on the fact that it was not distributed directly to investors as part of a finalized agreement. It does point out, however, that the document was clearly marked "INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT" See E & Y Reply at 4–5.

*such other documents which have been filed with the SEC, including the financial information and related notes contained therein, which are incorporated herein by reference.*

*See* Greenberg Aff., Ex. A, at 22 (emphasis added). Consequently, plaintiffs argue, the 14D–1 incorporates by reference Cendant's audited financial statements, contained in Cendant's public filings with the SEC.

This Court is constrained to conclude that plaintiffs have sufficiently plead facts which establish the "in connection with" element as to E & Y's alleged preparation of CUC's and Cendant's audited financial statements for the years 1995, 1996 and 1997. To repeat, this Court must determine whether (1) the statements were material and were disseminated in a medium upon which a reasonable investor would rely; and (2) whether E & Y "knew or had reason to know that Cendant would use its financial statements and audit reports when making a tender offer for shares of ABI common stock." *Semerenko*, 223 F.3d at 177. It should be noted that this language appears three times in the Third Circuit's opinion. Two references state that plaintiffs must establish that E & Y knew or had reason to know that Cendant would "use its financial statements and audit reports *when making the tender offer* for shares of ABI common stock." Both of those statements appear at 223 F.3d at 177 (emphasis added). The third statement appears in the conclusion, which requires a determination whether "it was reasonably foreseeable that Cendant would use its financial statements and audit reports *in its tender offer* for shares of ABI common stock." 223 F.3d at 187–188 (emphasis added). This Court agrees with the parties that the phrases "in its tender offer" and "when making a tender offer" are not explicitly defined. E & Y urges an interpretation of these statements that

would require the entire financial statements and/or audit reports to appear—either in full or in part—in the 14D–1s. Plaintiffs, on the other hand, argue that incorporation of the company's financial statements by reference in the 14D–1s is sufficient to satisfy that standard. E & Y relies upon the fact that the Third Circuit initially required only a finding of materiality and dissemination in a public medium. Only after E & Y petitioned for rehearing did the Court add the third requirement. The Third Circuit stated:

> In its petition for rehearing Ernst & Young contends that the alleged misrepresentations contained in the financial statements and audit reports that it prepared for Cendant should not be deemed to have been made in connection with the purchase of ABI common stock unless it was reasonably foreseeable that they would be *incorporated in the tender offer documents. We agree.*

223 F.3d at 176–177 (emphasis added). This statement implies that the interpretation E & Y now urges is too narrow: the Third Circuit did not state that the financial statements or opinions were required to appear—either in full or in part—in the tender offer documents—nor with specific reference to E & Y. Rather, the test requires only that the financial statements and E & Y's opinions be "incorporated in the tender offer documents" and that such incorporation was reasonably foreseeable to E & Y.

The Amended Complaint satisfies this test. Plaintiffs allege that E & Y performed audits of 1995, 1996, and 1997 financial statements, which were later incorporated into Cendant's public filings. *See* Am. Compl. ¶¶ 107–108; 111. The publicly filed financial statements were then incorporated by reference into the tender offer documents. Specifically, the 1995 through

1997 unqualified audit opinions issued March 19, 1996, March 10, 1997 and February 3, 1998 were included in 1995, 1996 and 1997 form 10–K's filed with the SEC. *See* Am. Compl. ¶ 111. While the February 1998 audit was not filed publicly until March 31, 1998, the two previous audits from 1995 and 1996 were publicly filed in 1996 and 1997, before the beginning of the class period. Moreover, although the 1997 financial statements were not filed with the SEC until March 31, 1998, the 14D–1s incorporate by reference all financial information filed with the SEC. *See* Greenberg Aff., Ex. A, at 22. Any reasonable investor who sought to educate herself about Cendant before deciding to purchase shares of ABI would be alerted to, and directed to, all of Cendant's financial statements filed with the SEC upon review of the tender offer documents. Thus a reasonable investor after March 31, 1998 may have relied upon the 1997 financial statements as well as the 1995 and 1996 statements.

E & Y also maintains that plaintiffs have failed to show that E & Y could reasonably have foreseen that the documents would be used in the tender offer, because there was no way E & Y could have known that Cendant-which did not yet exist-would make a tender offer for ABI shares at the time the audit opinions were issued. This Court does not interpret the Third Circuit's test to require that E & Y actually had reason to know of the possibility of the specific tender offer, but only that it could anticipate that its opinions would be used to make a tender offer in the future. As plaintiffs point out, as of the time of the ABI tender offer, Regulation 14D required, through Schedule 14D 1, a tender offeror to disclose current fi-

nancial information. *See* 17 C.F.R. §§ 240.14d 6(e)(1)(viii) (1997); 240.14d 100 (1997) ("Schedule 14D 1").[10] If the offeror provided summary information, it was required to provide instructions to the reader as to how to obtain "complete financial information." *Id.* E & Y cannot maintain that it was not foreseeable to it that CUC or any successor would refer readers to its complete, publicly filed financial statements as part of a tender offer.

Moreover, the tender offer documents, with their incorporated financial statements, formed a reliance base for a reasonable investor. E & Y does not dispute that investors would rely upon the tender offer documents. By incorporation of the financial statements, those documents were a medium upon which reasonable investors would rely. In *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir.1996), the Ninth Circuit reversed the grant of E & Y's motion to dismiss a Section 10(b) claim. Among other things, plaintiffs alleged that E & Y produced a fraudulent audit report for CPC, a publicly traded corporation, and that E & Y knew that CPC would include the report in its Form 10–K filed with the SEC. *Id.* at 397. That court explained that it was no defense that the case involved "the dissemination of false information to the investing public by way of an independent audit report contained in a Form 10–K," because such forms must be filed annually with the SEC and the stock price of a publicly traded company reflects information in such forms:

> *Corporate financial statements [including Form 10 Ks] are one of the primary sources of information available to guide the decisions of the investing public.* ... Indeed, federal reporting requirements, such as the Form 10–K,

**10.** These regulations have been modified slightly in form since Schedule 14D–1 was combined with the previous Schedule 13D

and renamed Schedule TO, effective January 2000.

exist 'to control the accuracy of the financial data available to investors in the securities markets....'

*Id.* (emphasis added), quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 810–811 n. 5, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

Similarly, in *In re Leslie Fay Companies, Inc.*, 871 F.Supp. 686 (S.D.N.Y.1995), a New York district court focused on the foreseeability of use of forms 10–K in connection with the sale of securities. *Leslie Fay* involved a Section 10(b) claim against an outside audit firm, BDO, for its issuance of unqualified audit opinions which were included in the company's 1990 and 1991 Form 10–Ks and in its annual reports to shareholders. *Id.* at 688. Plaintiffs alleged, among other things, that the statements failed to conform with several GAAP principles. The defendant, BDO, argued that because § 7 of the 1933 Securities Act requires an accountant's consent to use its statements in connection with a registration statement and Section 11(a)(4) allowed private suits against accountants only for misstatements made in connection with registration statements, the "in connection with" requirement of Section 10(b) was not meant to encompass non-public filings with the SEC. *Id.* at 696. The district court rejected such a narrow interpretation of the phrase used in Section 10(b), because of the differences between the 1933 and 1934 acts:

> [T]he purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions-to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer to be what it purports to be.

*Id.*, quoting *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). This Court similarly rejects the contention that E & Y must have explicitly consented to the use of its opinions in the 14D–1 documents filed with the SEC that pertained to the ABI tender offer in order for it to have been foreseeable to E & Y that its statements would be used by Cendant when making such a tender offer. That Sections 7 and 11 of the '33 Act require the accounting firm to have given consent to use its statements in connection with registration statements is not determinative here, because the purpose of the '34 Act is to protect individual investors from, among other things, purchase of securities with fraudulently inflated market prices. And nothing in Regulation 14D purports to require the same type of consent as that required under the '34 Act.

Both *Leslie Faye* and *McGann* distinguished *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 189–90 (7th Cir. 1993), which involved a sale of unregistered preferred stock in a onetime private placement to corporate insiders. There after collapse of the business, investors who had bought the preferred stock sued KPMG, the auditors, alleging that the audit of the previous year's financial statements was fraudulent because KPMG certified the financial statements as showing certain investments at the lesser of cost or market value, despite knowledge that the values of those investments should have been shown at market instead of cost. 2 F.3d at 186. The Seventh Circuit reversed a jury verdict to plaintiffs on the Section 10(b) claim because plaintiffs had failed to satisfy the "in connection with" requirement. *Id.* at 189–190. That court reasoned that KPMG had no reason to know that the "*audited financial statement would be used to offer any securities, let*

*alone the preferred stock sold in the private transaction at the end of 1984." Id.* at 190 (emphasis added). KPMG's witnesses denied knowledge that such a use would be made, and the company's main witness did not testify he informed KPMG of such a possible use. The court stated that many companies go years between securities offerings and that they must obtain consent of the accountants to use their financial statements. *Id.* In *McGann,* the Ninth Circuit distinguished *Frymire Brinati:*

> While an outside accounting firm might be blameless where it had no reason to know that its client would use its audit report to sell securities, or where it instructed its client not to release the report to the public, ... the instant plaintiffs squarely alleged that E & Y knew that CPC would include its audit opinion in a Form 10–K.

102 F.3d at 397. Similarly, *Leslie Fay* refused to adopt the narrow construction applied by *Frymire Brinati* that an auditor must have known of and consented to the use of its financial certifications in soliciting the purchase of securities. Rather, the *Leslie Fay* court deemed *Frymire Brinati's* interpretation to be no more than a restatement of the principle that "in connection with ... means that the fraud must have some direct pertinence to a securities transaction." *Id.* at 697. The audit reports in *Leslie Fay* were

> used in a scheme specifically designed to defraud the investing public.... BDO clearly knew their certifications would be included in Form 10–Ks and annual reports. Holding that BDO had no reason to know investors would utilize these documents in selling and purchasing Leslie Fay stock would ignore realities of large corporation secondary-market stock trading. In *Frymire–Brinati* ..., the securities were not in existence and

nothing indicated to the firm that Pepco was contemplating an offering in the future. By contrast, ... Leslie Fay had over 19 million shares outstanding when BDO performed its audit. Even if BDO had no reason to know that Leslie Fay would use its opinions to issue new securities, ... they clearly should have known investors in the secondary markets would rely on their certifications. *Id.* at 698. Although here, the securities sold were those of another company, ABI, and not Cendant, E & Y had reason to know that its financial reports, contained in the Form 10–Ks of Cendant and CUC, might be incorporated by reference into tender offer documents in the future. Consequently, this Court concludes that it was foreseeable to E & Y that its financial statements and audit opinions would be used by Cendant "when making" its tender offer.

In *Semerenko,* the Third Circuit emphasized:

> *[I]t is no defense* that the alleged misrepresentations were made in the context of a tender offer and a proposed merger, or that they *did not specifically refer to the investment value of the security that was bought or sold.* It is well established that information concerning a tender offer or a proposed merger may be material to persons who trade in the securities of the target company, despite the highly contingent nature of both types of transactions.
>
> ... *It is also settled that § 10(B) and Rule 10b 5 encompass misrepresentations beyond those concerning the investment value of a particular security.*
> ...

223 F.3d at 177 (emphasis added). *See also In re Ames,* 991 F.2d 953, 963 (2d Cir.1993) (claims may be "in connection with" a securities sale even if the misrepresentation pertains to a different security

from the one bought or sold); *Fischman v. Raytheon,* 188 F.2d 783, 786–787 (2d Cir. 1951) (allowing a 10b–5 action to proceed which was brought when plaintiffs, in reliance on a false and misleading registration statement that pertained to one company's preferred stock, purchased that company's common stock).

In *Heit v. Weitzen,* the Second Circuit noted that "[i]t is reasonable to assume that investors may very well rely on the material contained in false corporate financial statements which have been disseminated in the market place, and in so relying may subsequently purchase securities of the corporation." 402 F.2d 909, 913 (2d Cir.1968), *cert. denied,* 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). Under the rationale of our Circuit's opinion, it is similarly reasonable for an investor interested in the purchase of common stock of the target of a tender offer to rely upon public filings that purport to demonstrate the financial viability and integrity of the purchasing company. Thus the financial statements certified by E & Y were disseminated in a medium upon which a reasonable investor would rely. Furthermore, the financial condition of the offeror is likely material to investors considering purchase of the target company's stock. *Ames,* 991 F.2d at 967 (information is material if it contributes to the total mix of information made available to the investing public). Our Circuit and other courts have observed that a district court should determine "materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *Semerenko,* 223 F.3d at 178. The allegations are sufficient to sustain the materiality of E & Y's audit reports at this stage. Accordingly, plaintiffs have satisfied the "in connection with" requirement of Section 10(b).

## B. Post April 15, 1998 Purchases and Reliance under 12(b)(6)

The Third Circuit held that E & Y cannot be liable to purchasers of ABI stock after April 15, 1998. Shelton contends that Plaintiffs' complaint states that their claims against him end on April 9, 1998 because his employment ended on April 9, 1998. *See* Am. Compl. ¶ 9. Shelton is partially correct: He may not be liable for any of his own actions after April 9, 1998, but he may be liable to purchasers who relied upon his alleged misrepresentations before April 9. In any event, he may not be liable to any post-April 15, 1998 purchasers because the Third Circuit found that the April 15, 1998 announcement cured pre-April 15 misrepresentations.

Nevertheless, this Court was directed to make a finding as to when investors were no longer reasonably entitled to rely on the alleged misrepresentations contained in the April 15, 1998 announcement. Assuming that investors could reasonably rely upon the alleged misrepresentations in this announcement, this Court finds that the July 14, 1998 revelation by Cendant is sufficient to put a reasonable investor on notice that he or she should no longer rely upon the alleged misrepresentations in the April 15 announcement. The July 14 announcement stated that Cendant's 1997 net income would be reduced by 22 to 28 cents per share; that 1995 and 1996 year end and quarterly financial results would be restated; that the financial restatements would address irregularities in business units outside of CUC and that they affected all CUC major business units. Such information was sufficient to cure the alleged misrepresentations in the April 15 announcement.

## C. Rule 9(b) and Scienter

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circum-

stances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998). To satisfy Rule 9(b), plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo,* 155 F.3d at 658. Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (quoting *DiLeo v. E & Y,* 901 F.2d 624, 627 (7th Cir.1990)). Plaintiffs "need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Rolo,* 155 F.3d at 658 (citing *Seville Indus. Mach. v. Southmost Mach.,* 742 F.2d 786, 791 (3d Cir.1984)). The Third Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo,* 155 F.3d at 658 (citing *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir.1983)). A plaintiff who alleges securities fraud must "allege facts that give rise to a strong inference of scienter." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997). A plaintiff may establish this strong inference " 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence

of conscious misbehavior or recklessness.' " *Burlington,* 114 F.3d at 1418 (quoting *Acito,* 47 F.3d at 52).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(2), specifically addresses the scienter requirement of a Section 10(b) claim by requiring that a complaint which asserts a Section 10(b) claim "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2). This scienter requirement mirrors that formulated by the Second Circuit. *See Advanta,* 180 F.3d at 534; H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess. 41, 41 (1995), reprinted in 1995 U.S.C.C.A.N. 740, 740; S. Rep. 98, 104th Cong., 1st Sess. 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694. As the Third Circuit announced in *Advanta,* "Congress's use of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit." *Advanta,* 180 F.3d at 534. To satisfy this pleading requirement, plaintiffs must state with particularity either (1) facts which show that defendants had both motive and opportunity to commit fraud; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See id.; see also Burlington,* 114 F.3d at 1418; *Acito,* 47 F.3d at 52. Recklessness, in turn, involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior."

*Id.; c.f. In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir.1999) (stating that plaintiffs "can no longer aver intent in general terms ... but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent"). Under the Reform Act, "motive and opportunity" allegations must be supported "by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter." *Advanta*, 180 F.3d at 535.

### 1. E & Y

■ Plaintiffs allege that E & Y issued unqualified audit reports for CUC's 1995, 1996 and 1997 financial statements, despite that operating income was overstated by $500 million during those years. Am. Compl. ¶¶ 107; 69(a). These audit opinions were later incorporated into CUC's Form 10 Ks and Cendant's public filings and reports. *See* Am. Compl. ¶¶ 107–108; 111. Plaintiffs allege that CUC's financial statements included operating income for CUC that was inflated for each of the first three quarters in 1995 by $31 million; in 1996 by $87 million; and in 1997 by $176 million. Am. Compl. ¶ 69(b). They allege that CUC improperly recognized revenues on an accelerated basis in relation to its recognition of associated expenses, which inflated earnings by $27 million in 1995; by $23 million in 1996; and $41 million in 1997. Am. Compl. ¶ 69(d). Plaintiffs allege that Cendant's financial statements understated the Comp UCard membership cancellation reserve which inflated income by $48 million in 1995; $19 million in 1996; and $12 million in 1997; and that Cendant improperly reversed approximately $115 million of merger reserves into income at year-end 1997 to make up for what was publicly reported and what was recorded on the company's books. Am. Compl. ¶¶ 69(e); (c).

Plaintiffs also claim that E & Y's audits were not performed in accordance with GAAS and that its unqualified audit reports, as included or incorporated in CUC's and Cendant's annual and quarterly financial statements for 1995, 1996 and 1997 filed with the SEC, were materially false and misleading. Am. Compl. ¶¶ 108, 109, 111. Specifically, plaintiffs aver that E & Y knew or was reckless in not knowing that CMS's (and as a result, Cendant's) reported annual financial results for fiscal years 1995, 1996 and 1997, included in Cendant's January 14D–1 and March 14D–1, and in Cendant's 1997 10–K, disseminated to the investing public, were materially overstated and not presented in accordance with GAAP, that E & Y's audits were not performed in accordance with GAAS, and, therefore, that E & Y's unqualified audit reports, as included or incorporated by reference in Cendant's Form 10–K's and quarterly reports and tender offer documents were materially false and misleading. Am. Compl. ¶ 108. They allege that E & Y's audit reports which were included in Cendant's SEC filings and certified that (i) E & Y had audited CUC's and CMS's financial statements in accordance with GAAS; (ii) had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (iii) in its opinions, CUC's and CMS's financial statements "present fairly, in all material respects, the financial position" of CUC and CMS "in conformity with generally accepted accounting principles"; and (iv) E & Y's audits provided a "reasonable basis" for its opinions. Am. Compl. ¶ 109. Plaintiffs further allege that the reports were materially false and misleading because E & Y failed to make a reasonable investigation or possess reasonable grounds for the belief that the statements were true, were without omissions of material facts, and

were not misleading. Am. Compl. ¶ 110. Plaintiffs allege that "E & Y, with knowledge or reckless disregard of the false and misleading nature of the statements contained in its unqualified audit reports, and with knowledge or reckless disregard of the true nature of its audits, caused" material misstatements to be included in materials filed with the SEC and disseminated to the public. Am. Compl. ¶ 111. The complaint alleges that E & Y knew or recklessly disregarded that it had not performed its audits of CUC's 1995 and 1996 financial statements and its audit of CMS's 1997 financial statements in accordance with GAAS, and therefore that its unqualified audit reports on CUC's and CMS's financial statements for those years were materially false and misleading. Am. Compl. ¶ 113. The complaint asserts that E & Y failed to obtain sufficient competent evidential matter to form a basis for its unqualified reports. *Id.* Paragraph 113 of the Complaint provides a detailed list of particularized factual examples of E & Y's failure to perform its audits in accordance with GAAS: Under GAAS, the auditor must exercise professional skepticism and "diligently perform ... the gathering and objective evaluation of evidence." "In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU §§ 230.07–09 (1998); AU §§ 316.16–21 (1997). In its performance of audit procedures regarding items such as merger reserves, revenue recognition, membership cancellation reserves, E & Y relied almost exclusively on representations of CUC and CMS management. Am. Compl. ¶ 113(b). Plaintiffs charge that E & Y failed to obtain direct evidence in connection with CUC's and CMS's recording of revenue and elimination or reduction of expenses as a result of write offs of merger reserves. Instead, E & Y relied largely on management's representations. As a result, $108 million of those reserves were written off in 1997 directly to revenue in violation of GAAP. Another $7 million of those reserves were used to offset expenses that were not related to the purpose of those reserves, also without conceptual basis. E & Y either knew or was reckless in not knowing that all of those adjustments were unsupported by documentation." Am. Compl. ¶ 113(a)(1). The complaint alleges that E & Y was reckless in not knowing that Cendant and CUC did not comply with their stated membership revenue recognition policy by realizing certain revenue immediately; in not knowing that Comp U Card improperly deferred expenses in programs that recognized revenue immediately; and that Comp–U–Card improperly reclassified revenue from deferred recognition programs. Am. Compl. ¶ 113(a)(3). The Complaint further charges that E & Y was reckless in not knowing that CUC used its membership cancellation reserve improperly by periodically reversing that reserve into income, and in not knowing that CUC improperly understated the membership cancellation reserve. Am. Compl. ¶ 113(a)(4); 113(a)(6). It alleges that E & Y was reckless in failing to audit CUC's many unsupported and improper adjusting journal entries made to the membership cancellation reserve, which adjustments were apparent from CUC's general ledger and in failing to determine whether CUC's and CMS's general ledgers supported CUC's and CMS's financial statements. As example, there was a gap of approximately $170 million between the amount of revenue reported b@y Comp U Card in its reporting package for the first three quarters of 1997, and the amounts reflected on the "topside-adjusted" consolidating report for that period, both of which E & Y had. Am. Compl. ¶ 113(a)(7)-(8).

The complaint also claims that E & Y violated the principle that the auditor must obtain a level of knowledge of its clients' businesses sufficient to enable it to "obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements." AU § 311.06. In this regard, the pleadings allege that E & Y failed to obtain sufficient knowledge about: CUC's and CMS's accounting and reporting systems to recognize the importance of post-closing adjustments; the use of manual journal entries in CUC's and CMS's accounting data; CUC's and CMS's business and transactions upon which to assess the propriety of management's accounting treatment of asset write-offs, renewed contracts and the future usefulness of computer systems; and to evaluate the propriety and consistency of CUC's and CMS's application of accounting principles to revenue recognition. *See* Am. Compl. ¶ 113(c)(1)-(5). E & Y is also alleged to have violated the principles that address an auditor's duty to assess the "risk of material misstatement of financial statements due to fraud." AU 316.12 (1998); AU 316.05 (1997). Conditions that should alert the auditor to the possibility of fraud include discrepancies in accounting records, such as actions not properly recorded as to amount, accounting period classification, unsupported or unauthorized balances or transactions; conflicting or missing evidential matter such as significant unexplained items on reconciliations; or denied access to records. AU §§ 316.259, 317.09 (1998); AU §§ 316.21, 317.09 (1997). Plaintiffs allege that E & Y violated these principles because it failed to properly consider the risk of material misstatement of the financial statements as a result of fraud or irregularities, primarily in that E & Y failed to *"recognize hundreds of unsupported and improper journal entries or the significance of the many material rec-*

*onciling items on bank and other reconciliations. E & Y also did not sufficiently consider, if at all, that it was not provided with Comp U Card's reporting packages."* Am. Compl. ¶ 113(e) (emphasis added).

This Court previously denied a motion to dismiss the Lead Plaintiffs' Amended Complaint against E & Y in the consolidated class action litigation against Cendant and E & Y on 9(b) and scienter grounds, based upon virtually identical allegations against E & Y. This Court found that "[p]laintiffs' allegations that E & Y failed to obtain direct evidence to support CUC's and Cendant's financial statements but relied instead on the representations of management evidences recklessness." *In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 373 (D.N.J.1999). As was the case there, plaintiffs here have more than adequately plead recklessness, or acts that rise to the level of pleading conscious misbehavior.

> A showing of shoddy accounting practices amounting at best to a "pretended audit," or of grounds supporting a representation "so flimsy as to lead to the conclusion that there was no genuine belief [ ] of it" have traditionally supported a finding of liability in the face of repeated assertions of good faith.

*McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979) (citation omitted). *See also, Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir.2000) (auditor may be liable for recklessness if its conduct was " 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care.' It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company."); *Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d 1003, 1011 (S.D.Cal.2000) (scienter may be established against accountant if "accounting practices were so deficient that the audit amounted to no audit at all, *or an egregious refusal to see the obvious,*

*or to investigate the doubtful,* or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.") (emphasis added); *Zucker v. Sasaki,* 963 F.Supp. 301, 307 (S.D.N.Y.1997) (accountant's violation of GAAP and GAAS may establish scienter if the "accounting practices were so deficient that the audit amounted to no audit at all" or that the accountant's judgments were such that *"no reasonable accountant would have made the same decisions if confronted with the same facts."*) (emphasis added).

While it is true that a violation of GAAP will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter. *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1313 (C.D.Cal.1996); *First Merchants,* 1998 WL 781118, *10.

" 'Other circumstances suggesting fraudulent intent' can include the presence of *'red flags'* or warning signs that the financial reports are fraudulent, *as well as the magnitude of the alleged fraud." First Merchants,* 1998 WL 781118, at *10 (emphasis added), quoting *Miller v. Material Sciences Corp.,* 9 F.Supp.2d 925, 927 (N.D.Ill.1998) ("[d]eliberately ignoring "red flags" such as those alleged here can constitute the sort of recklessness necessary to support 10(b) liability."). *See also Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ("[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy"); *In re Health Management Sec. Litig.,* 970 F.Supp. 192,

203 (E.D.N.Y.1997) (allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent); *In re Leslie Fay,* 835 F.Supp. at 175 ("in cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b–5 claim. On the other hand, *when tidal waves of accounting fraud are alleged, it may determine that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading* ") (emphasis added).

The *First Merchants* district court held that allegations against Deloitte & Touche that it violated numerous provisions of GAAP and GAAS, deliberately ignored several red flags in the financial statements which would have exposed fraud, and failed to detect an overstatement of its client's net worth by approximately $90 million dollars were sufficient to withstand a motion to dismiss on scienter grounds. 1998 WL 781118, at *11. The Court concluded, "[T]he allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit 'amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful.' " *Id.*

Those cases upon which E & Y relies are distinguishable. *Rothman,* for example, refused to find that scienter had been adequately plead against an auditor who failed to discover that certain royalty advances had been recognized as income, although it was unlikely that the company would recover royalty advances from future sales. 220 F.3d at 98. The court there reasoned that the complaint did not allege facts from which it was reasonable to infer that the auditor knew that most of

the company's sales of that product usually occurred within a year of the product's release; nor was such knowledge inferred from the length of the relationship between the company and its auditor. *Id.* Similarly, *Zucker v. Sasaki,* 963 F.Supp. 301 (S.D.N.Y.1997), found insufficiently plead allegations of scienter against E & Y. There however, the allegations in the complaint were essentially based upon the auditor's status as an outside auditor. Although plaintiff alleged that E & Y improperly approved the amount of goodwill attributable to the purchase price of the company's acquisition and took issue with the length of the amortization period, no facts had been plead to show that E & Y knew or recklessly disregarded information that indicated the company's acquisition would fail. 963 F.Supp. at 305–306, 309. Although other acts of E & Y were alleged, such as its audit of the company's fiscal year report in 1994, those took place after the plaintiff had purchased her shares and therefore were not considered in the court's analysis. *Id.* at 306–307. Unlike *Rothman* and *Zucker,* here E & Y is not charged with simple failure to investigate individual suspicious entries or failure to become familiar with some idiosyncratic aspect of CUC's business; rather, it is charged with reckless disregard of numerous-even hundreds-of unsupported entries, including manipulation of membership reserves, reversal of merger reserves and the use of large, unsupported "topside" entries that were inconsistent with the books and ledgers of the various business units.

E & Y references *In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 F.Supp.2d 505 (S.D.Ohio 2000). However, that court held that the complaint failed to allege any red flags that should have alerted defendants to the accounting errors. Even *Reiger,* which found insufficiently plead allegations of scienter against accountant PriceWaterhouseCoopers based solely on the magnitude of the fraud (an overstatement of financial results by approximately $5 million dollars), recognized that the magnitude of the fraud can support an inference of scienter "when the plaintiff pleads specific and detailed facts showing that the magnitude *either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous.*" 117 F.Supp.2d at 1013 (emphasis added).

Here plaintiffs have plead numerous detailed facts to show both that the magnitude of the fraud enhanced the suspiciousness of identified transactions or made the overall fraud glaringly conspicuous. While this Court is not prepared to say that plaintiffs' allegations amount to a showing of such shoddy practices that the audits were at best "pretended audits," the allegations that E & Y failed to discover hundreds of fraudulent accounting entries, in combination with the sheer magnitude of the revenue and earnings overstatements, as well as the "red flags" of lack of evidential matter and numerous unsupported entries, (particularly the reversal of merger reserves into income, manipulation of membership reserves and improper use of unsupported topside entries), if proven, demonstrate an egregious refusal to see the obvious or investigate the doubtful such that no reasonable accountant would have made the same decisions if confronted with the same facts. These circumstances are sufficient to establish a strong inference of scienter.

█ In addition, this Court finds that plaintiffs have adequately plead the "who, what, when, where and why" required by Rule 9(b): The "what" are the audit reports which certified the 1995 through 1997 financial statements as having no material misstatements and certified that

they were performed in accordance with GAAS and that the statements complied with GAAP, and which materially misstated the Company's true earnings, revenues, and income. The "who" is E & Y. The "where" and "when" are the financial reports later filed in CUC's and Cendant's Form 10–K's and later incorporated into the January and March 14D 1's. The "why" is that the statements were misleading because E & Y's opinion that the financial statements were prepared in accordance with GAAP and Audited in accordance with GAAS was false, and that the financial statements grossly misrepresented revenues, earnings and operating income in 1995, 1996 and 1997. *See In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97–C–2715, 1998 WL 781118 (N.D.Ill. Nov. 4, 1998).

### 2. Cendant

Cendant moves to dismiss only those claims by post-April 15, 1998 ABI stock purchasers because plaintiffs' premise is that after the existence of accounting irregularities was disclosed on April 15, 1998, Cendant chose not to reveal all that Cendant knew when it made such voluntary public disclosure of the fraud and continued to make misrepresentations as to the severity of the irregularities after the April 15 disclosure.

### a. *Circumstantial Evidence of Misbehavior or Recklessness*

### (i) *April 15, April 27 and May 5 Press Releases*

To establish circumstantial evidence of misbehavior or recklessness by Cendant beyond April 15, 1998, plaintiffs rely primarily upon the April 15, April 27, and May 5, 1998 press releases. The April 15, 1998 press release stated that Cendant had discovered potential accounting irregularities "limited" to former CUC business

units that were part of Cendant's Alliance Marketing Division; that the irregularities occurred in CUC businesses that "accounted for less than one third" of Cendant's 1997 net income; that it expected to restate annual and quarterly net income and earnings per share for 1997 and might restate certain other previous period related to the former CUC businesses; and the 1997 results would reduce net income by approximately $100 to $115 million and reduce earnings per share by about 11 to 13 cents. Am. Compl. ¶ 49. Plaintiffs maintain that this statement "did not fully disclose Cendant's true financial condition." Am. Compl. ¶ 52.

On April 27, 1998, Cendant, by a letter sent to shareholders and published over the newswires, signed by defendant Walter Forbes and President and CEO Henry Silverman, stated that "The vast majority of Cendant's operating businesses and earnings are unaffected" by the accounting irregularities. Am. Compl. ¶ 55.

The May 5, 1998 press release announced Cendant's first quarter 1998 earnings and said that over "eighty percent of the Company's net income for the first quarter of 1998 came from Cendant business units not impacted by the potential [CUC] accounting irregularities." According to plaintiffs, the statements in the April 27 and May 5 press releases were "false and misleading and made with knowledge of or reckless disregard for the facts known to defendants." Am. Compl. ¶ 56. Cendant speculates that the allegation regarding the May 5 press release must be based upon Cendant's restatement of the first quarter 1998 earnings in its Form 10 Q filed on October 13, 1998 with the SEC. *Id.* Plaintiffs do not address this allegation in their brief. Nor do plaintiffs address the restatement in the Complaint. The Court finds that the Complaint contains no allegation why the May

5 press release was false or misleading nor any allegations why it was made with the requisite knowledge or recklessness.

■ Cendant argues that the April 15, 1998 press release does not demonstrate scienter because Cendant merely underestimated the extent of the accounting irregularities and plaintiffs failed to plead any particular facts from which it can be inferred that the underestimates were made with an intent to deceive. Cendant Br. at 13. An "estimate" is actionable securities fraud if (1) the person or entity that made the estimate did not actually believe that it was accurate or (2) the estimate lacked any reasonable basis. *See In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 (3d Cir.1993). Cendant argues that the Amended Complaint contains no allegations of fact that would show why the statements were misleading at the time they were made or any fact that Cendant knew at the time of the press release the statements in that release were inaccurate. Cendant Br. at 13–14. Although this Court has previously upheld claims based upon the alleged misrepresentations contained in the April 15, 1998 press release and other press releases, those complaints contained sufficiently particularized allegations of conscious misbehavior or recklessness and/or motive and opportunity. *See Daystar Special Situations Fund L.P. v. Cendant Corp.,* 76 F.Supp.2d 531 (D.N.J. 1999) (upholding post April 15, 1998 claims against certain HFS defendants when plaintiffs had alleged scienter based upon defendants' sales of securities just before the April 15 press release and personal assurances to plaintiffs that Cendant's losses would fall within the range anticipated by the April 15 release); *In re Cen-*

*dant Corp. Litig.,* 60 F.Supp.2d 354, 374 (D.N.J.1999) (refusing to dismiss Section 10(b) claims asserted by purchasers of Cendant stock post April 1998 against HFS directors, based upon allegations of insider sales by HFS defendants, inclusion of $23 million of income questioned by E & Y as improperly recognized in its 1997 financial statements in February 1998, and several March 1998 meetings at which defendants allegedly discussed how to reverse $165 of the Cendant merger reserve into income in 1998).

Cendant protests that plaintiffs have not plead particularized facts to show that Cendant knew the April 15 or May 5 press releases were inaccurate. As to the April 15 release, Cendant avers that an SEC cease-and-desist order entered June 14, 2000 found that it was "legacy HFS officials" who constituted Cendant senior management as of April 15 and who discovered and disclosed the irregularities on April 15, 1998. Cendant Reply at 7, citing *Security and Exchange Commission Release Notice,* Exchange Act Release No. 34–42933, 2000 WL 766595, at *13 n. 2 (June 14, 2000). Cendant argues that because plaintiffs have not alleged that these same HFS officials had knowledge of the accounting irregularities before April 15, they have not plead that the persons responsible for the April 15 press release knew the full extent of the accounting irregularities at that time. Cendant Reply at 8. Plaintiffs have plead only that the statements regarding the accounting irregularities and first quarter 1998 earnings in the April 15, April 27 and May 5 press releases were inaccurate.[11] The Court agrees that plaintiffs have plead no facts that would raise an inference that Cen-

11. Plaintiffs point out in a footnote that the Complaint in the consolidated shareholder class action alleged that Cendant knew as of April 15, 1998 that the actual restatement would be at least $280 million. Plaintiff Br. at 56 & n. 31. Plaintiffs make no similar allegation here.

dant's management as of April 15, 1998, which consisted primarily of former HFS officials, knew that the irregularities were more extensive than disclosed in the April 15 announcement as of April 15, April 27, or even May 5, 1998. Although plaintiffs' cite myriad allegations in the Complaint which purport to support the inference that Cendant knew or should have known those statements were false and/or misleading, those allegations are largely irrelevant. As example, plaintiffs point to allegations that Forbes stated in his April 27, 1998 letter to shareholders that the vast majority of Cendant's businesses and earnings were unaffected by the irregularities; that the Audit Committee found that Forbes and Shelton were among those who should bear responsibility for the irregularities; and that Corigliano directed numerous quarterly adjustments. *See* Plaintiff Br., at 52–55, citing Am. Compl. ¶¶ 54–55, 70–71. However, none of these allegations pleads facts to raise a strong inference that the April 15 and later statements were made with knowledge or reckless disregard of their falsity. "Conclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b)." *Acito,* 47 F.3d at 53. "[A] restatement of earnings, without more, does not support a strong inference of fraud, or for that matter, a weak one." *Segue Software,* 106 F.Supp.2d at 169. Similarly, a restatement that is larger than estimated does not support such an inference without specific factual allegations of knowledge. These press releases do not support a strong inference of conscious misbehavior or recklessness.

### (ii) *Intent to Close the ABI Deal*

■ Plaintiffs allege that beginning April 15, 1998, Cendant made repeated announcements of its commitment to close the ABI tender offer and/or merger and that those announcements were false and

misleading because Cendant had no intent to do so. *See* Am. Compl. ¶¶ 53–56; 60. Plaintiffs also allege that after Cendant announced the restatement would be twice that previously announced and that the irregularities had occurred in other CUC business units, Cendant continued to represent to the public its commitment to the deal. *See* Am. Compl. ¶¶ 60, 61. Cendant asserts that these allegations fail to state any particularized facts from which it can be inferred that such statements were false and misleading when made or that Cendant had reason to know they were false and misleading. Cendant argues that plaintiffs merely assume that because the merger and tender offer were ultimately terminated, the statements of intent to complete the tender offer and merger must have been false when they were made. *See* Cendant Br. at 17. One may not plead scienter by reference to statements that

> predict[ ] a prosperous future and hold[ ] them up against the backdrop of what actually transpired ... This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of "alleging fraud by hindsight."

*Shields,* 25 F.3d at 1129. *See also Maldonado v. Dominguez,* 137 F.3d 1, 9–10 (1st Cir.1998) (scienter not sufficiently alleged by bare allegation that defendant must have had knowledge of facts contradicting its statements); *Suna v. Bailey Corp.,* 107 F.3d 64, 69 (1st Cir.1997) (plaintiffs must show (1) statements were false or misleading at the time they were made; and (2) "that it is reasonable to believe that the defendants knew they were false and misleading."). Plaintiffs allege only that the statements of intent to consummate the merger must have been false because the merger was ultimately terminated by

agreement of ABI and Cendant. They do not allege any facts to support an inference that the statements were false and misleading at the time they were made. These allegations are "solely the product of hindsight" and do not establish scienter under Rule 9(b) or the Reform Act.

More significant is plaintiffs' allegation that Cendant acted with a motive to falsely inflate Cendant's stock price in order to use fewer shares of Cendant stock to effectuate the second half of the stock for stock merger, scheduled to take place after the tender offer was completed. This theory is wholly inconsistent with allegations that Cendant had no intent to consummate the tender offer at all. At oral argument, plaintiffs argued that the theories are not inconsistent because plaintiffs do not contend that Cendant had no intent to consummate the ABI deal until July 15; before July 15, say plaintiffs, they rely solely on the alleged misrepresentations of the full extent of the accounting irregularities. Once the extent of the irregularities were more fully disclosed on July 14, continue plaintiffs, Cendant was suddenly no longer committed to the tender offer and merger. This argument finds no support in the Complaint. Rather, plaintiffs have plead a consistent, ongoing scheme beginning April 15, 1998, in which Cendant repeatedly reaffirmed its commitment to the merger despite having no intent to complete it. *See* Am. Compl. ¶¶ 53–56; 60. Moreover, even if this Court were to consider in isolation the July 15, 1998 representation under plaintiffs' alternative theory expressed at oral argument,[12] the Complaint contains no allegation of facts that this representation was false or misleading when made. *See* Am. Compl. at ¶ 61.

Again, plaintiffs may not rely upon the assumption that because the merger and tender offer ultimately were terminated, the statement must have been false.

### b. *Motive and Opportunity*

Plaintiffs plead Cendant was motivated to commit fraud because: "(a) Defendants had a strong incentive to keep Cendant's share price as high as possible until the ABI Merger was completed in order to allow Cendant to use fewer shares to fund the tender offer price; (b) Defendants needed to keep Cendant's share price artificially inflated in order to consummate acquisitions, including the ABI Merger; and (c) Defendants' manipulation of CUC's and Cendant's financial records was done to keep the company from violating loan covenants and allow the Company to maintain access to financing in order to consummate acquisitions...." Am. Compl. ¶ 92.

Plaintiffs attempt to support these pleadings by reference to Cendant's Third Party Complaint against E & Y, *In re Cendant Corporation Securities Litig.*, Civ. A. No. 99 cv 3996, in which Cendant alleges that as a result of the revelation of accounting irregularities (1) its credit rating was downgraded, which made it more difficult to obtain financing; (2) Cendant was forced to withdraw from certain transactions it had previously negotiated, including one which for which incurred a $400 million penalty [which plaintiffs assume refers to the ABI transaction]; and (3) Cendant's acquisition plans were adversely affected. *See* Plaintiff Br. at 20. These allegations are not made in the complaint. Plaintiffs may not amend the

---

12. This Court would be required to consider any alleged misrepresentation made on or after July 15, 1998 apart from any pre-July 15 statement, because it has already concluded that the July 14, 1998 disclosure cured any alleged misrepresentation-sufficient to defeat the element of reasonable reliance-regarding the extent of accounting irregularities contained in the April 15 announcement.

pleadings through assertions contained in a brief in opposition to a motion to dismiss. *See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). In any event, such alleged motives are insufficiently plead to support a strong inference of scienter:

### (i) *Motive to Keep Cendant's Price High*

 Cendant responds that not only have plaintiffs failed to allege any facts to support the existence of the motive to keep Cendant's share price high until after the merger, this assertion cannot be true because Cendant would have been required to wait until after the restatement to complete the tender offer and merger because various state insurance regulations require the submission of audited financial statements. Cendant Br. at 15, citing Fla. Admin. Code Ann. r. 4–143.056. Although plaintiffs do not contest this requirement, they dispute that this argument dispenses with the motive because "securities markets are less punishing to a company's stock price when negative news is leaked a little at a time, than when a huge fraud is disclosed at one time." Plaintiff Br. at 21. Cendant replies that this contention itself is without factual support and, moreover, neither this fact nor Cendant's knowledge thereof is plead in the Complaint. Cendant Reply at 4.

Cendant also refers to *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994), which held that the defendants' motive to keep the company's stock price inflated by failure to disclose the inadequacy of a loan loss reserve in several public announcements failed to plead a sufficient opportunity to derive a benefit from the alleged nondisclosures. There, the court concluded that discovery of the inadequacy of the loss reserve was inevitable in the ordinary course of business and thus "[i]t is hard to see what benefits accrue from a short respite from an inevit-

able day of reckoning." *Id.* Cendant likens its situation to that of defendants in *Shields*, because the information was bound to be revealed as a result of the SEC investigation or United States Attorney's investigation, with which Cendant cooperated. *See* Cendant Br. at 16 & n. 10; *see also Acito*, 47 F.3d at 53 ("mere allegations that statements in one report should have been made in earlier reports do not make out a claim for securities fraud."); *In re Segue Software, Inc. Sec. Litig.*, 106 F.Supp.2d 161, 169–170 (D.Mass.2000) (the "suggestion that the defendants may have chosen to postpone the day of reckoning in the hope that fortune might smile in the interval is unsubstantiated speculation."). Plaintiffs distinguish *Shields* because there, the plaintiffs had plead only the defendants' incentive to maintain the benefits of their positions, whereas here these plaintiffs have plead the incentive to keep the stock price high to complete a specific merger using as few Cendant shares as possible, to consummate other acquisitions and to avoid violation of loan covenants and to maintain access to financing for such acquisitions. *See* Plaintiff Br. at 21, citing *Market Street Secs. v. Racing Champions Corp.*, No. 00–C–3267, 2000 WL 1727788 (N.D.Ill. Nov. 21, 2000) (plaintiff class adequately plead motive against defendant company who allegedly failed to disclose material adverse information about its financial condition when that company was in process of acquisition of another company and had promised an increased payment to the acquired company if its stock fell below a certain price; inference of scienter established by allegation that "defendants' agreement with Ertl would cost them more money if the value of Racing Champions stock fell below a certain price in the days preceding the actual acquisition"). In *Market Street*, however, the motive of the company to maintain its price was buttressed by alle-

gations that one high-level corporate insider sold over half his shares during that period. 2000 WL 1727788, at *4. Here plaintiffs make no such additional allegation. In light of the requirement that Cendant could not have completed the tender offer and merger until after its financial information was restated, this Court finds plaintiffs' argument that Cendant was motivated to cushion the fall through piecemeal dissemination of information unpersuasive.

Furthermore, as already stated, the alleged motive to keep Cendant's stock price falsely inflated is illogical and inconsistent with the simultaneous contention that Cendant had no intent to complete the tender offer and merger. Without the intent to complete the deal, Cendant could have had no motive to keep the price high because such would be irrelevant without a specific transaction to fuel.

### (ii) *Motive to Consummate Other Acquisitions*

Plaintiffs allege that Cendant also wanted to keep the stock price high in order to consummate other transactions. The only other transactions plaintiffs mention in the complaint that were pending at the time of the April 15, 1998 press release involved National Parking Corporation and Providian Auto and Home Insurance Company. Am. Compl. ¶ 92; Cendant Reply at 4. However, according to Cendant, the public record establishes that Cendant was to pay cash for the proposed transactions, not stock, and these transactions provided no incentive to keep Cendant's stock price fraudulently inflated. Cendant Reply at 4–5. Plaintiffs do not dispute this argument. Plaintiffs have failed to plead why these pending transactions provided Cendant a motive to keep its stock price high.

### (iii) *Motive to Avoid Violation of Loan Covenants*

The allegation that Cendant was motivated to avoid violation of its loan covenants is unsupported by any specific factual allegation. This unsupported allegation is insufficient to establish circumstantial evidence of misbehavior or recklessness. Moreover, such an alleged motive is belied by (1) the April 15 disclosure, which was an immediate violation of its loan covenants, and (2) Cendant's promptly obtaining of waivers from its lenders to keep its financing in place on its original terms. Cendant Reply Br. at 5. Plaintiffs' allegations are inadequate to establish scienter through motive and opportunity.

### 3. Individual Defendants

#### a. *Specific Allegations*

Plaintiffs plead:

- The "wide range of fraudulent accounting entries were directed and/or overseen by CUC corporate executives, including the Cendant defendants, and were imposed on CUC Personnel to ensure that CUC's earnings would match analysts' expectations." (Am. Compl. at ¶ 72);

- The individual defendants had "access to internal corporate documents, including the Company's operating plans, budgets and forecasts and reports of actual operations" and "knowledge of the details of the Company's financial affairs and results." (Am. Compl. at ¶¶ 13, 92);

- The Audit report concluded that the wide range of fraudulent accounting entries were directed and/or overseen by CUC corporate executives, including the Cendant Defendants, and were imposed on CUC personnel to ensure that CUC's earnings would match analysts' expectations; it also found that over one-third of CUC's total reported income was deliberately and fictitiously manufactured during 1995 through

1997, notwithstanding Cendant's previous representation that the problems were limited to a small portion of the Company (Am. Compl. at ¶ 72);

- The Audit Committee found that Shelton was "among those who must bear responsibility for what happened at CUC" and also found that senior management failed to have in place appropriate controls and procedures to enable the detection of irregularities (Am.Compl.¶¶ 70–71);

- E. Kirk Shelton had "access to internal corporate documents, including the Company's operating plans, budget forecasts and reports of actual operations" and "knowledge of the details of the Company's financial affairs and results." (Am.Compl.¶¶ 13, 92);

- Shelton both had the "ability and opportunity to prevent [the] issuance" of various materially false and misleading statements and did not do so (Am. Compl.¶ 105);

- Audit Report found that CUC's Chief Financial Officer, Cosmo Corigliano, who reported to Shelton, directed the adjustments to increase quarterly income and knew about or directly participated in other fraudulent activities; that Shelton advanced a plan that involved the improper reversal of merger reserves into revenues in 1998 and that he authorized over $500,000 of airplane expenses incurred by Forbes in 1995 and 1996 which were improperly charged to the CUC/HFS merger reserve (Am.Compl.¶ 71);

- McLeod was senior officer and director of CUC and Cendant and was involved in the day to day affairs of the company and "had knowledge of the details of the Company's financial affairs and results." (Am.Compl.¶¶ 92, 105);

- McLeod was Vice Chairman and a director of Cendant from the time of the merger until he resigned on October 12, 1998 and was Executive Vice President of CUC a member of CUC's Board of Directors and reported directly to Forbes (Am.Compl.¶ 11);

- McLeod was the CEO of CUC Software and president of the Comp–U–Card division of Cendant in which many of the accounting irregularities occurred (Am.Compl.¶¶ 11, 49, 76); and

- McLeod had "access to internal corporate documents, including the Company's operating plans, budgets and forecasts and reports of actual operations." (Am.Compl.¶ 13).

The only specific factual allegations against Shelton (apart from his position, access to documents, and knowledge of the company's affairs) charge that he authorized Walter Forbes' airplane expenses which were later charged to the merger reserve and also advanced a plan that involved the improper reversal of merger reserves into revenues in 1998. *See* Am. Compl. ¶ 71. Shelton claims the first of these allegations, even if true, does not "implicate Shelton in the alleged cast scheme upon which the Amended Complaints are based, and does not rise to an inference of scienter." Shelton Br., at 15 n. 3; *see also* Shelton Reply at 6–7. Shelton does not address the allegation that he advanced a plan to reverse merger reserves into revenues in 1998. However, plaintiffs are not required to plead facts that would establish that Shelton was responsible personally for the entire scheme, only facts that he made a false or misleading statement and did so with scienter. That he falsely charged a company executive's travel expenses to a merger reserve and suggested the reversal of merger reserves into income unquestionably state

facts, which, if proved, would give rise to a strong inference of misbehavior or recklessness. Plaintiffs have adequately plead scienter against Shelton and have described the alleged fraud with the requisite particularity.

Because the complaint adequately alleges scienter against Shelton, it is not necessary to address the remaining allegations against him. However, the Complaint contains no specific factual allegations against McLeod apart from his position, access to internal corporate documents and knowledge of the company's affairs. It is thus necessary to examine the more general allegations directed at him.

■ Plaintiffs argue that McLeod's "knowledge of falsity (or recklessness) may be inferred" from his positions within the company. Plaintiff Br. at 13, 26. However, this Court has previously dismissed actions against individual defendants in other related actions and observed that it cannot "infer scienter based on the defendant's positions as a director or officer of Cendant or CUC. *This general basis for liability has been rejected by numerous courts.* ..." *McLaughlin v. Cendant Corp.,* 76 F.Supp.2d 539, 547 (D.N.J.1999) (emphasis added) (dismissing 10(b) claim against Forbes based on his position); *see also Kennilworth Partners L.P. v. Cendant Corp.,* 59 F.Supp.2d 417, 428 (D.N.J.1999) (dismissing Section 10(b) claim against Forbes, McLeod and other Cendant directors because court may not "infer scienter based on the defendants' positions as directors or officers of Cendant or CUC."). *See also In re Health Management Inc. Sec. Litig.,* 970 F.Supp. 192, 205 (E.D.N.Y.1997) (if the court inferred scienter from mere fact of director's position, then "executives of virtually every corporation in the United States would be subject to fraud allegations"). This allegation may support scienter only when " 'taken together with ... *more specific allegations linking their positions to their knowledge.'* " *Kennilworth,* 59 F.Supp.2d at 428 (emphasis added), quoting *Ballan v. Wilfred American Educational Corp.,* 720 F.Supp. 241, 253 (E.D.N.Y.1989). In an extension of this argument, plaintiff's allegation against McLeod that he had knowledge of day-to-day affairs of the Company by virtue of his positions at CUC and Cendant is not sufficient, on its own, to create any inference of scienter. *See Advanta,* 180 F.3d at 539, ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.' ... *Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company.*") (emphasis added).

Plaintiffs also plead that the Court may infer scienter because the "Individual Defendants had 'access to internal corporate documents, including the Company's operating plans, budgets and forecasts and reports of actual operations' and 'knowledge of the details of the Company's financial affairs and results.' " This Court has also previously determined that scienter would not be inferred because defendants "had access to facts in their roles as directors or officers of Cendant or CUC." *Kennilworth,* 59 F.Supp.2d at 428; *see also Blum v. Semiconductor Packaging Materials Co.,* No. C.A. 97–7078, 1998 WL 254035, at *3 (E.D.Pa. May 5, 1998) (allegations of access to internal corporate information are "literally true in almost any securities claim" against directors and officers of a corporation and alone is "inadequate to demonstrate a strong inference of fraudulent intent").

Plaintiffs contend their complaints differ from those of *Kennilworth* and *McLaughlin*, which relied solely on "defendants' positions as directors and officers of Cendant," and that their complaints do link defendant's position as officers or directors to their knowledge of the fraud. They cite *In re Cendant Corporation Litigation*, 60 F.Supp.2d 354, 369 (D.N.J.1999), which upheld a Section 10(b) claim against McLeod contained in the Lead Plaintiffs' Amended Complaint in the common stock class action. *In re Cendant* upheld consolidated shareholders' claims against McLeod based on allegations of the various positions he held at Cendant and CUC, coupled with allegations that he (1) was the CEO of CUC Software and President of Comp U Card division of Cendant, in which many of the accounting irregularities occurred; (2) "received Comp–U–Card's annual budgets, reporting packages from Comp–U–Card and other subsidiaries, and all Projection Model schedules which were among the very documents utilized to effectuate the fraud"; and (3) "was aware of improper revenue recognition practices at CompU Card but took no action to correct the improper accounting." This Court held that such allegations of McLeod's "access to financial information, knowledge of the irregular accounting practices, and his failure to remedy the accounting irregularities constitute facts which demonstrate recklessness if not conscious behavior." *Id.* However, there plaintiffs specifically plead McLeod's knowledge of CUC's manipulation of merger reserves and of Comp–U–Card's improper revenue recognition practices, not just his receipt of reporting packages. Moreover, the plaintiffs there asserted that McLeod knew of at least one specific transaction in which Cendant Software's 1997 income was increased improperly through an unsupported $5.4 million entry of miscellaneous income but took no action

to correct that. *Id.* at 370. This evidence of conscious misbehavior or recklessness was supported by motive and opportunity, in that plaintiffs plead McLeod received over $15.9 million from his stock sales during the class period. *Id.*

However, here plaintiffs' complaint is devoid of the specific allegations such as McLeod's receipt of Comp–U–Card budgets and other documents used to effectuate the fraud or any allegation that McLeod was aware of improper revenue recognition practices and failed to correct them. Nor do plaintiffs allege knowledge of any specific improper transaction or motive and opportunity on the basis of McLeod's stock sales. Without such allegations, plaintiffs are left with no more than assertions that because of McLeod's positions and access to certain financial information, he must have known of the accounting practices. Such are insufficient to establish scienter.

Plaintiffs argue that the Complaint alleges that a wide range of fraudulent accounting entries were directed and/or overseen by CUC corporate executives, including the CUC defendants. Pl. Br. at 13, citing Am. Compl. ¶ 72. McLeod protests against this "tactic of group pleading." This Court has previously held such group pleadings inadequate to plead scienter of a particular defendant. *See Kennilworth*, 59 F.Supp.2d at 417 (dismissing complaint in which "plaintiffs [ ] lump[ed] the defendants together and ma[d]e general conclusory allegations of wrongdoing.").

### b. *Collective "Group Published" Statements*

■ Plaintiffs contend that their allegations that the Cendant defendants collectively published statements and engaged in violations of GAAP sufficiently establishes scienter under Rule 9(b) and

the PSLRA. Plaintiffs plead that the individual defendants collectively participated in the dissemination of the financial statements and in the issuance of various materially false and misleading press releases, including: (1) the January and March 14D–1 filings; (2) the March publication of the tombstone advertisement of the tender offer; (3) the February 4, 1998 BusinessWire story that stated 1997 fourth quarter financial results; (4) the February 1998 filing of the 1997 Form 10K; (5) the April 15, 1998 announcement which revealed the accounting irregularities; (6) the April 27, 1998 announcement regarding Cendant's intent to complete the merger and limited effects of the accounting irregularities; (7) the May 5, 1998 announcement of first quarter 1998 earnings; and (8) the July 14, 1998 announcement that the earnings restatement for 1997 would reduce net income by more than twice what was previously announced on April 15, 1998; that 1995 and 1996 financial results would be restated; that previously undisclosed irregularities had been discovered outside the membership business and would be restated; and that the irregularities affected all of CUC's major business units. *See* Plaintiff Br. at 27. Plaintiffs maintain that these allegations also establish that the "individual defendants" knew or should have known the financial statements in the January 27, 1998 and March 17, 1998 14D–1s were materially overstated. *Id.* at 27. They also conclude these facts demonstrate that the initial restatement estimate of April 15, 1998 was materially understated.

Accordingly, plaintiffs implore this Court to follow the "group published information" doctrine, which they argue would allow the allegations that misstatements contained in company documents (such as the above press releases and SEC reports) to be presumed to be the "collective work of that company's directors and officers."

*Id.* at 27–28, & n. 13, citing *In re Aetna Sec. Litig.*, 34 F.Supp.2d 935, 948 (E.D.Pa. 1999). *Aetna* explained:

> Under this doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in *group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other "group published information" that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.* ...
> In the typical scenario, the group pleading doctrine is used, as Plaintiffs have done here, to attribute group published information to senior executives of a corporate defendant.

34 F.Supp.2d at 949 (emphasis added), quoting *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). However, *Aetna* assumed for the purposes of the motion before it that the doctrine was still viable but acknowledged that it was unclear whether this doctrine survived the passage of the PSLRA. *Id.* at 949, comparing *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.1998) (holding PSLRA heightened pleading standards did not abolish the doctrine), *with Coates v. Heartland Wireless Comm'ns, Inc.*, 26 F.Supp.2d 910, 915–16 (N.D.Tex. 1998) (holding PSLRA banned the group pleading doctrine). In *Coates,* a Texas district court held that the PSLRA bans the group pleading doctrine because it allows pleadings on information and belief. 26 F.Supp.2d at 916. *Coates* reasoned that an information-and-belief pleading can be supported by facts such as the corporate policy in issuing press releases or the individual defendant's position with the company. To illustrate, if an allegedly misleading press release contained financial information, a plaintiff could "plead on

information and belief that the chief financial officer is responsible for making the statement *if the plaintiff can plead with specificity why the officer's position directly involves such duties or why a specific corporate policy requires that the chief financial officer make such releases."* *Id.* at 916 & n. 2 (emphasis added).

The *Coates* court further explained:

[A] plaintiff must state with particularity the facts that give rise to a strong inference that the defendant acted with the required state of mind.... This requirement is fairly interpreted to require that a plaintiff allege facts regarding scienter as to each defendant.... It is nonsensical to require that a plaintiff specifically allege facts regarding scienter as to *each defendant,* but to allow him to rely on group pleading in asserting that the defendant made the statement or omission.

*Id.* (emphasis added). *See also Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998) ("[t]o permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each fact or omission by the defendant. The group published doctrine permits an inference of wrongdoing not based on defendant's conduct, but solely on defendant's status as an officer or director of a corporation."). Notwithstanding the apparent disagreement among courts as to whether this doctrine is still viable, at least one district court in this Circuit-post-*Aetna*-has embraced *Coates* rejection of its continued viability post-PSLRA. In *Marra v. Tel Save Holdings, Inc.,* a Pennsylvania district court held, for the same reasons offered by *Coates,* that the doctrine was no longer viable, observing, "[t]he continued vitality of the judicially created group pleading doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pled with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" No. 98–3145, 1999 WL 317103, *5 (E.D.Pa. May 19, 1999).

This Court agrees with *Coates'* and other district courts' refusal to recognize the group published information doctrine after the passage of the PSLRA. Otherwise, the requirement to plead scienter with particularity as to each defendant is meaningless, and the ability to plead on information and belief, unnecessary. Plaintiffs mistakenly maintain that *Coates* nevertheless "concluded that allegations that a defendant had responsibilities for a company's financial statements would be sufficient to hold that defendant liable for false statements regarding the company's financial condition." Plaintiff Br. at 28–29. However, *Coates* actually stated that such allegations would be sufficient only if coupled with *allegations of a specific corporate policy* that required a particular officer to be responsible for certain information. 26 F.Supp.2d at 916 & n. 2. Plaintiffs contend that the "group published information doctrine" should apply because plaintiffs have alleged that the Audit Committee discussed the evidence that accounting and financial personnel participated in irregular activities and concluded that Shelton was among those who must bear responsibility. Plaintiff Br. at 29, citing Am. Compl. at ¶ 70.

Because plaintiffs have failed to allege either why the officers' position necessarily involve such duties or why a specific corporate policy required any of those officers' to have responsibility for such press releases and/or SEC filings, plaintiffs' allegations that are lumped together against the various corporate executives are rejected

for failure to plead fraud with particularity.

McLeod replies that (1) this Court has already rejected allegations that "lump the defendants together and make general conclusory allegations of wrongdoing" in *Kennilworth,* 59 F.Supp.2d at 428–430; and (2) even if such a presumption were allowed, plaintiffs have still failed to allege that the alleged misstatements were made with fraudulent intent, which they have not. *See* McLeod Reply, at 9 & n. 5. This Court agrees-even if plaintiffs could plead such allegations collectively against defendants, they have still failed to plead with specificity why McLeod knew or should have known any of the alleged "group published" misstatements were false or misleading. Accordingly, they have failed to plead the "who, what, when, where and why" required by Rule 9(b).

Plaintiffs also allege that the individual defendants' scienter is evidenced by the fact that Cendant's public statements about its intent to proceed with the ABI purchase had "no reasonable basis in fact." However, as already said, plaintiffs have plead no specific fact from which one might infer that Cendant's statements about its intent to consummate the ABI merger were false or misleading at the time they were made. These allegations are inadequate to sustain any claim against McLeod.

### c. *Motive and Opportunity*

■ Plaintiffs also maintain that their complaint pleads opportunity and motive to commit fraud.

Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935, 955 (E.D.Pa.1999), quoting *Shields,* 25 F.3d at 1130.

The motives alleged are that the Individual Defendants, along with Cendant (the "Cendant Defendants"):

(a) had a strong incentive to keep Cendant's share price as high as possible until the ABI Merger was completed to allow Cendant to use fewer shares to fund the tender offer price; (b) needed to keep Cendant's share price artificially inflated in order to consummate acquisitions, including the ABI Merger; and (c) desired to prevent the Company from violating loan covenants and allow the company to maintain access to financing in order to consummate acquisitions.

Pl. Br. at 19–20, quoting Am. Compl. ¶ 92. However, because these motives are insufficient to establish a legally plausible inference that Cendant acted with scienter, they are also insufficient as against McLeod.

Plaintiffs contend that "Defendants do not dispute their opportunity to commit fraud." Plaintiff Br. at 19. But that does not relieve plaintiffs of the requirement to *plead* both motive and opportunity if this is their chosen method to establish scienter. To sufficiently plead opportunity, plaintiffs must allege that defendants had the opportunity to carry out the means. In *Aetna,* the district Court found absent any allegations that the defendant director "had the means to cause [Defendant] to make the statements he made, to cause Aetna to issue the press releases and alleged overstate financial statements that it did, or to cause Peat Markwick, Aetna's outside accountant, to issue its opinions concerning the accuracy of the financial statements." 34 F.Supp.2d at 956. Similarly, there is no particularized allegation here that McLeod had the means to cause any of the alleged misrepresentations to be

made, other than the references to his positions in the company and access to internal information about the company's affairs.

d. *Leave to Amend*

█ Plaintiffs request leave to amend the Complaint in the event this Court determines plaintiffs have not sufficiently plead scienter. Pl. Br. at 18–19 n. 4. They seek to add the following allegations:

(1) on March 6, 1998, Shelton asked other CUC employees to be "creative in reversing $165 million of the Cendant Reserve into income in 1998";

(2) Forbes, Shelton and McLeod received subsidiary and Comp–U–Card reporting packages, but did not correct the improper accounting at those subsidiaries;

(3) defendants McLeod and Shelton knew of Comp–U–Card's practice of recognizing certain revenue immediately, even though it violated CUC's stated policy;

(4) Shelton knew of CUC's long-standing non-GAAP policy of deferring rejects-intransit;

(5) The SEC found that CUC's "senior management devised an operated a systematic scheme to inflate operating income at CUC ...."; and

(6) The SEC found CUC's senior management had planned and orchestrated "a massive fraudulent financial reporting scheme that caused dramatic investor losses."

Pl. Br. at 19.

Because the Court has already concluded the Amended Complaint in its present form sufficiently alleges scienter against Shelton, allegations (1) and (4) are unnecessary. Allegations (5) and (6) are impermissible group pleadings and futile.

Although plaintiffs have not technically followed the dictates of Local Rule 7.1(e)(2) by attaching a proposed amended complaint (the reason for that requirement being to allow the Court to scrutinize the sufficiency or futility of the proposed amendments), allegations (2) and (3) would remedy the defect in plaintiffs' pleadings-albeit just barely-sufficient to sustain a claim against McLeod. In the consolidated shareholder class action, this Court sustained a Section 10(b) claim against McLeod's Rule 9(b) and scienter challenges, based upon very similar allegations. *See* 60 F. Supp.2d at 370. Although slightly less specific than those in the consolidated class action complaint, the allegations that McLeod had knowledge of irregular accounting practices and failed to remedy them state facts which, if proven, would establish recklessness, if not conscious misbehavior. *See id.* As there, Plaintiffs may amend the Complaint one last time to add these two allegations.[13] However, this Court will uphold the claim against McLeod only if plaintiffs file the new amended complaints within fifteen days of the date of entry of this opinion and order.

---

**13.** McLeod also protests that plaintiffs should not be allowed to amend their complaint because they have not amended the complaint despite being on notice the complaint would be subject to Section 9(b) challenge, have had access to information that would be necessary to permit the amendment, and already had one opportunity to amend. However, the Third Circuit explicitly directed that if this Court finds the Complaint deficient under Rule 9(b), "the Class should be 'afforded an additional, albeit final opportunity, to conform the pleadings.'" 223 F.3d at 173, quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1435.

Although the proposed amended allegations might be sufficient to support an inference of scienter against McLeod, this Court is cognizant of the Circuit's holding that the April 15, 1998 announcement was sufficient to cure pre-April 15, 1998 alleged misrepresentations. *Semerenko,* 223 F.3d at 181. Because, as with their allegations against Cendant, plaintiffs have failed to plead any particular facts from which one might conclude either that (1) McLeod was responsible for publication of the April 15, 1998 or any later announcement; or (2) McLeod knew that information in the April 15 announcement was false or misleading, McLeod may not be liable to members of the class who purchased ABI stock after April 15, 1998.

### IV. *Section 20(a) Claims*

■ Both Shelton and McLeod move to dismiss plaintiffs' claims under Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against them. They argue that defendants have failed to allege culpable participation by them in a fraudulent scheme. Shelton further argues that because a substantial portion of plaintiffs' fraud claim is based upon post-April 9 events, he cannot be liable for those events.

Section 20(a) creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Exchange Act. To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 885 (3d Cir.1975).

Plaintiffs have plead an underlying violation of Section 10(b) of the Exchange Act by Cendant, the controlled entity. They have alleged that each of the "individual defendants" including Shelton and McLeod-was a "controlling person" within the meaning of Section 20(a) by virtue of his position as a top executive officer of CUC and the Company,

> as well as his close working relationship, [and that each] *had the power and influence, and exercised the same, to cause the Company and the other Individual Defendants, to engage in the unlawful acts, conduct and practices complained of herein.* ... The Individual Defendants were able to, and did, directly or indirectly ... control the content of Cendant's public financial reports, filings with the SEC, and public statements, particularly that which reflected the financial condition of CUC during the relevant time described herein. Each Individual Defendant was provided, for his approval or otherwise, with copies of Cendant's reports, filings, releases, and statements herein alleged to have been materially false and misleading prior to or shortly after their issuance by the Company, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

Am. Compl. ¶ 105 (emphasis added).

Plaintiffs have stated a Section 20(a) claim. They have plead that Cendant, the controlled entity, violated Section 10(b) of the Exchange Act. Plaintiffs have also alleged that both Shelton and McLeod were controlling persons within the meaning of Section 20. Finally, they have sufficiently alleged "culpable participation" by both Shelton and McLeod. Culpable participation may be alleged by allegations of knowing and substantial participation in wrongdoing or by deliberate inaction, done intentionally to further the fraud. *VT In-*

*vestors v. R & D Funding Corp.*, 733 F.Supp. 823, 841 (D.N.J.1990), citing *Rochez*, 527 F.2d at 890. Here plaintiffs have alleged participation by Shelton that he knowingly manipulated merger reserves. Plaintiffs have also alleged knowing participation and deliberate inaction by McLeod because their proposed amendments allege that McLeod received subsidiary and Comp–U–Card reporting packages, had knowledge of the improper revenue recognition practices at Comp–U–Card, but failed to correct them. These allegations are sufficient to plead that McLeod and Shelton participated in the underlying fraud. Although neither Shelton nor McLeod may be liable to post-April 15, 1998 purchasers, they remain potentially liable under Section 20(a) to pre-April 15, 1998 purchasers. As this Court has previously observed, the ultimate determination of whether defendants were controlling persons involves questions of fact to be resolved by the factfinder. *See In re Cendant Corp. Litig.*, 60 F.Supp.2d at 379–380.

## CONCLUSION

For the foregoing reasons, E & Y's motion to dismiss plaintiffs' Section 10(b) claim for failure to satisfy the "in connection with" requirement and failure to satisfy Rule 9(b) and the scienter pleading requirements is denied; Cendant's motion to dismiss plaintiffs' Section 10(b) claims for failure to plead fraud with particularity and to plead the requisite scienter is granted; Shelton's motion to dismiss plaintiffs' Section 10(b) and 20(a) claims is granted as to purchasers after April 15, 1998 but denied as to purchasers before April 15, 1998; and McLeod's motion to dismiss plaintiffs' Section 10(b) and 20(a) claims is granted as to purchasers after April 15, 1998, but is denied as to purchasers before April 15, 1998, subject to plaintiffs' filing Second Amended Complaints consistent with this opinion within fifteen

days of the date of entry of this opinion and order.

**SO ORDERED.**

## *ORDER*

This matter having been opened to the Court by the motions of defendants Cendant Corporation ("Cendant"), Ernst & Young LLP ("E & Y"), E. Kirk Shelton ("Shelton"), and Christopher McLeod ("McLeod") to dismiss the Amended Complaints in the above consolidated action; this Court having heard oral argument on March 12, 2001; and for the reasons stated in the accompanying opinion,

It is on this day of May, 2001:

ORDERED that E & Y's motion to dismiss [*39*] plaintiffs' Section 10(b) claims for failure to satisfy the "in connection with" requirement and for failure to plead fraud and scienter with particularity as required by Rule 9(b) and Section 10(b) is DENIED; it is further

ORDERED that Cendant's motion to dismiss [*41*] plaintiffs' Section 10(b) claims based upon post-April 15, 1998 purchases of ABI stock for failure to plead fraud and scienter with particularity as required by Rule 9(b) and Section 10(b) is GRANTED; it is further

ORDERED that Shelton's motion to dismiss [*33*] plaintiffs' Section 10(b) and Section 20(a) claims is GRANTED as to purchasers of ABI stock after April 15, 1998, but is DENIED as to purchasers of ABI stock before April 15, 1998; it is further

ORDERED that McLeod's motion to dismiss [*36*] plaintiffs' Section 10(b) and Section 20(a) claims is GRANTED as to purchasers of ABI stock after April 15, 1998, but is DENIED as to purchasers of ABI stock before April 15, 1998, SUBJECT to plaintiffs' filing a Second Amend-

ed Complaint as required in this ORDER; and it is further

ORDERED that plaintiffs' request for leave to file a Second Amended Complaint in the above actions is GRANTED, consistent with the accompanying opinion; such amended pleadings to be filed within fifteen (15) days of the date of entry of this order. If plaintiffs fail to file the required amended pleadings by that date, McLeod's motion to dismiss the Section 10(b) and 20(a) claims of purchasers before April 15, 1998 will be GRANTED.

**SO ORDERED.**